Steven L. Woodrow*
(swoodrow@woodrowpeluso.com)
Patrick H. Peluso*
(ppeluso@woodrowpeluso.com)
Woodrow & Peluso, LLC
3900 East Mexico Ave., Suite 300
Denver, Colorado 80210
Telephone: (720) 213-0675
Facsimile: (303) 927-0809

Stefan Coleman, Esq.*
LAW OFFICES OF STEFAN COLEMAN, P.A.
201 S Biscayne Blvd, 28th Floor
Miami, Florida 33131
Telephone: (877) 333-9427
law@stefancoleman.com

*pro hac vice
Additional counsel appearing on signature page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NATHAN GERGETZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>TELENAV, INC., a Delaware corporation<br><br>Defendant. | CASE NO.:  5:16-cv-4261-BLF<br><br>**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM IN SUPPORT**<br><br>Judge:  Hon. Beth Labson Freeman<br><br>Hearing Date:  September 6, 2018<br>Time:  1:30 p.m. |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

I.      INTRODUCTION .................................................................................................. 1

II.     THE FACTS, THE LAW, AND THE LITIGATION HISTORY .............................. 1

        A.      The TCPA and its Implementing Regulations .......................................... 1

        B.      Summary of the Litigation, Mediation, and Settlement ........................... 2

                1.      The Plaintiff's Claims and The Litigation History ..................... 3

                2.      The Mediation and Settlement History ....................................... 4

III.    KEY TERMS OF THE SETTLEMENT AGREEMENT ......................................... 6

        A.      Class Definition ........................................................................................ 6

        B.      Monetary Relief ....................................................................................... 6

        C.      Release of Liability .................................................................................. 7

        D.      Notice and Administrative Expenses ........................................................ 7

        E.      Class Representative Incentive Award ..................................................... 7

        F.      Reasonable Attorneys' Fees and Expenses .............................................. 7

IV.     THE NOTICE COMPORTS WITH DUE PROCESS ............................................. 8

V.      THE SETTLEMENT WARRANTS FINAL APPROVAL ..................................... 10

        A.      The Strength of Plaintiff Gergetz's Case .............................................. 11

        B.      The Risk, Expense, Complexity, and Duration of Further Litigation ........... 14

        C.      The Risk of Maintaining Class Action Status ........................................ 14

        D.      The Amount Offered in Settlement ......................................................... 16

        E.      The Extent of Discovery Completed and the Stage of Litigation ................... 18

        F.      The Experience and Views of Counsel .................................................. 19

        G.      The Presence of a Governmental Participant ......................................... 20

        H.      The Reaction of Class Members to Date ................................................ 21

        I.      There is No Evidence of Collusion and Other Red Flags ....................... 21

VI.   THE SETTLEMENT CLASS MAY BE CERTIFIED—IN re HYUNDAI
      PRESENTS NO BAR TO APPROVAL HERE ........................................................ 24

VII.  CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

*ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018) ...........................................2

*Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012)....................................12, 15

*Bellows v. NCO Fin. Sys., Inc.*, No. 07-CV-01413,
    2008 WL 5458986 (S.D. Cal. Dec. 10, 2008)................................................13, 19

*Bridgeview Heath Care Ctr. Ltd. v. Clark*, 2011 WL 4585028 (N.D. Ill. Sept. 30, 2011) ...........12

*Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848 (N.D. Cal. 2010) ...............................21

*Churchill Vill, L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ...................................11, 14, 21

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992)................................................11

*Cour v. Life360, Inc.*, No. 16-cv-00805-TEH, 2016 U.S. Dist. LEXIS 98945 (N.D. Cal. July 28,
    2016)........................................................................................................13

*Dominguez v. Yahoo, Inc.*, 894 F.3d. 116 (3d Cir. 2018)................................................13

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)....................................................8

*Forcellati v. Hyland's Inc.*, 2014 WL 1410264 (C.D. Cal., Apr. 9, 2014) ...................................21

*Gardner v. GC Servs., LP*, No. 10-CV-0997,
    2012 WL 1119534 (S.D. Cal. Apr. 2, 2012) ................................................15, 19

*Garner v. State Farm Mut. Auto Ins. Co.*, No. 08-CV-1365, 2010 WL 1687832
    (N.D. Cal. Apr. 22, 2010)...................................................................*passim*

*Gene and Gene, LLC v. Biopay LLC*, 541 F.3d 318 (5th Cir. 2008)............................................13

*Gragg v. Orange Cab Co., Inc.*, C-12-0576, 2013 WL 1788479 (W.D. Wash. Apr. 26, 2013).....2

*Grant v. Capital Mgmt. Srvs., L.P.*, No. 11-56200, 2011 WL 3874877 (9th Cir. Sept. 2, 2011) ...2

*Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723 (N.D. Ill. 2011)........................12

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)........................................................16

*Harris v. Vector Mktg. Corp.*, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) .............................19

*Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. Cal. 2011).........................................................23

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) .....................21, 22, 23

*In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781 (N.D. Ill. 2015)..............18

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F. Supp. 2d 320 (D. Me.
    2005)........................................................................................................21

*In re Consumer Privacy Cases*, 175 Cal. App. 4th 545 (Cal. Ct. App. 2009) ............................. 23

*In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX, 2011 WL 3861703
    (C.D. Cal. Aug. 31, 2011) .................................................................................... 22, 23

*In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679 (9th Cir. 2018) ........................................ 24

*In re Hyundai And Kia Fuel Econ. Litig.*, No. 15-56014, 2018 WL 3597310
    (9th Cir. July 27, 2018) ............................................................................................ 24

*In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454 (9th Cir. 2000) ........................................... 14, 21

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)...................................... 14

*In re Pac. Enters. Sec. Litig.,* 47 F.3d 373 (9th Cir. 1995) ......................................................... 20

*In re Patriot Am. Hospitality Inc. Sec. Litig.*, MDL 00-1300, 2005 WL 3801594
    (N.D. Cal. Nov. 30, 2005) ........................................................................................ 19

*In re TJX Cos. Retail Sec. Breach Litig.,* 584 F. Supp. 2d 395 (D. Mass. 2008)........................ 21

*Jaffe v. Morgan Stanley & Co.,* No. 06-CV-3903, 2008 WL 346417 (N.D. Cal. Feb.7, 2008).... 16

*Kim v. Space Pencil, Inc.*, No. 11-CV-03796, 2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) .... 14

*Lane v. Facebook, Inc.,* 696 F.3d 811 (9th Cir. 2012) ................................................................ 11

*Lee v. Stonebridge Life Ins. Co.,* No. 11-CV-0043 RS, 2013 WL 542854
    (N.D. Cal. Feb. 12, 2013)................................................................................... 12, 15

*Malchman v. Davis*, 761 F.2d 893 (2nd Cir. 1985)..................................................................... 23

*Martin v. AmeriPride Servs., Inc.*, No. 08-CV-440,
    2011 WL 2313604 (S.D. Cal. June 9, 2011) ......................................................... 13, 16, 20

*Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338 (9th Cir. 1980).......................................... 8

*Mims v. Arrow Financial Svcs's, LLC*, 132 S. Ct. 740 (2012)....................................................... 2

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ...................................................... 10, 12, 20, 21

*Odrick v. UnionBancal Corp.*, No. 10-CV-5565,
    2012 WL 6019495 (N.D. Cal. Dec. 3, 2012) ......................................................... 19

*Officers for Justice v. Civil Serv. Comm'n of City and Cnty. of S.F.*,
    688 F.2d 615 (9th Cir. 1982)................................................................ 10, 11, 13

*Powers v. Eichen*, 229 F.3d 1249 (9th Cir. 2000) ....................................................................... 22

*Rannis v. Recchia*, 380 F. App'x 646 (9th Cir. 2010).................................................................. 8

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) ...................................... 15, 17

*Rose v. Bank of Am. Corp.*, Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014) ................................................. 18

*Ross v. Trex Co., Inc.*, No. 09-CV-00670, 2013 WL 791229 (N.D. Cal. Mar. 4, 2013) ............... 8

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ............................................. 2

*Schiller v. David's Bridal, Inc.*, No. 10-CV-00616, 2012 WL 2117001 (E.D. Cal. June 11, 2012).................................................... 11

*Shames v. Hertz Corp.*, No. 07-CV-2174, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ....... 11, 21

*Silber v. Mabon,* 18 F.3d 1449 (9th Cir. 1994) ............................................................................. 8

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)..................................................................... 22

*Strong v. BellSouth Telcoms., Inc.,* 173 F.R.D. 167 (W.D. La. 1997) ......................................... 21

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)............................................................. 15

*Wren v. RGIS Inventory Specialists*, No. 06-CV-05778, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011)....................................................................... 10, 23

*Young v. Polo Retail, LLC*, 02-CV-4546, 2007 WL 951821 (N.D. Cal. Mar. 28, 2007).............. 14

**STATUTES, RULES, SECONDARY SOURCES**

Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715........................................................ 9, 21

Conn. Gen. Stat. § 42-288 (1996) ............................................................................................ 25

Conte & Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2002)............................... 8, 11

FEDERAL JUDICIAL CENTER, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* 3 (2010)............................................................................. 8

Fed. R. Civ. P. 23, *et seq.* ...................................................................................................*passim*

N.J. Stat. Ann. § 48:17-28 (West 1998) ..................................................................................... 25

Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ........................................... 1, 2, 12

1    **I.      INTRODUCTION**

2           The class action Settlement reached in this case—concerning claims against Defendant

3    Telenav, Inc. ("Defendant" or "Telenav") for allegedly unlawful text messages under the

4    Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA")—has been a success.

5           In accordance with the Court's Preliminary Approval Order, Notice of the class action

6    Settlement Agreement was sent to the Settlement Class, and the response has been

7    overwhelmingly positive. Defendant has agreed to create a Settlement Fund in the amount of

8    three million five-hundred thousand dollars ($3,500,000 USD) from which Settlement Class

9    Members may make claims for a proportional share (after deducting for administrative costs,

10   fees, expenses, and other amounts). No Settlement Class Members have requested exclusion or

11   objected. Rather, as of August 17, 2018, 1,991 claims have been filed and approved (1,939 on

12   behalf of No Consent Subclass Members, 42 on behalf of Stop Subclass Members, and 10 on

13   behalf of members of both subclasses) and an additional 250 claims await processing, resulting

14   in a present-day Award Unit value of approximately $960.[1] As such, claimants in the No

15   Consent Subclass are set to receive approximately $960 each, while the 41 members of the Stop

16   Subclass will be sent checks that exceed $4,785 (with members of both subclasses set to receive

17   $5,744). Such benefits are demonstrably fair, reasonable, and adequate and worthy of final

18   approval. Indeed, this Settlement Agreement secures amounts that readily exceed individual

19   claimant amounts typically awarded in TCPA class actions settlements.

20          As such, and as explained further below, the Court should find the Settlement is fair,

21   reasonable, and adequate and grant final approval. (*See* Proposed Order, attached as Ex. A.)

22   **II.     THE FACTS, THE LAW, AND THE LITIGATION HISTORY**

23          Prior to analyzing the Settlement, it is helpful to review the TCPA, the history of

24   Gergetz's claims, and the litigation and process that culminated in the Agreement.

25          **A.      The TCPA and its Implementing Regulations.**

26          Congress enacted the TCPA in 1991 as a response to "[v]oluminous consumer complaints

27   _____

28   [1] These calculations assume a Fee Award of 33%, an Incentive Award of $5,000, and projected administrative costs of $230,000 and will decrease as the remaining claims are processed.

about abuses of telephone technology….” *Mims v. Arrow Financial Svcs's, LLC*, 132 S. Ct. 740, 744 (2012). The law “protect[s] the privacy interests of telephone subscribers.” *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *see also Mims,* 132 S. Ct. at 745. The TCPA applies with equal force to text message calls. *Satterfield,* 569 F.3d at 954. To prevail, a plaintiff must show that a person: (1) made text message calls, (2) using an Automatic Telephone Dialing System (“ATDS”)[2], (3) to a telephone number assigned to a cellular telephone service. *See* 47 U.S.C. § 227(b)(1)(A)(iii). Prior express consent is an affirmative defense. *See, e.g.*, *Grant v. Capital Mgmt. Srvs., L.P.*, No. 11-56200, 2011 WL 3874877, at *1 n.1 (9th Cir. Sept. 2, 2011) (explaining that “‘[E]xpress consent’ is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof.”). Consumers retain the ability to revoke consent. *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 709 (D.C. Cir. 2018) (“It is undisputed that consumers who have consented to receiving calls otherwise forbidden by the TCPA are entitled to revoke their consent.”) (citing 2015 Declaratory Ruling, 30 FCC Rcd. at 7996 ¶ 62). Applied here, Gergetz alleges that Telenav's text messaging platform continued to send him (and numerous others) text messages even after they had replied “STOP” or with a similar opt-out command to revoke any consent previously provided.

The TCPA sets statutory damages in the amount of $500 per violation (trebled to $1,500 if the violations are found to have been willful) and provides for injunctive relief. *See* 47 U.S.C. § 227(b)(3)(A-B). A review of the claims and the settlement process follows.

**B.    Summary of the Litigation, Mediation, and Settlement.**

---

[2] An ATDS means “equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.” 47 U.S.C. § 227(a)(1). The FCC, in turn, has explained that equipment that dials or sends texts to a list of numbers is an ATDS, because “‘the basic function of such dialing equipment’ is the same— ‘the capacity to dial numbers without human intervention.’” *Gragg v. Orange Cab Co., Inc.*, C-12-0576, 2013 WL 1788479, at *2 (W.D. Wash. Apr. 26, 2013) (citing *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 73 Fed.Reg. 6041, 6042 (Feb. 1, 2008)). Had the case failed to settle, a major issue would have been whether Telenav's system qualifies as an ATDS, which has been further called into question by *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 704 (D.C. Cir. 2018) (rejecting FCC's latest interpretation of ATDS).

1      As explained in prior briefing, this case involves two types of alleged violations: (1)

2  claims that Gergetz and others received text messages without their consent from a Telenav

3  phone number (a short code or long code that Telenav used for text messages) urging them to

4  "Download the App," (or similar language) and (2) claims that Gergetz and others allegedly

5  responded "STOP" (or with a similar opt-out command) to the messages they received from

6  Telenav but the messages continued to be sent. (*See* Declaration of Steven L. Woodrow

7  ("Woodrow Decl."), attached hereto as Ex. B ¶ 3.) There are approximately 201,800 Settlement

8  Class Members in total.[3]

9      Following early discussions between the lawyers for both sides and an exchange of

10  informal discovery regarding Telenav's text messaging platform and its processing of opt-outs,

11  the Parties engaged in a mediation with Mr. John Bates of JAMS, San Francisco. (Woodrow

12  Decl. ¶ 9.) Mr. Bates has experience mediating large and complex cases, including TCPA class

13  actions. The discussions were hard fought, and each side expressed a willingness to simply

14  continue litigating. Although a settlement wasn't reached at the mediation, the Parties continued

15  to negotiate with Mr. Bates's help—ultimately reaching the instant Agreement on the eve of the

16  hearing on Telenav's Motion to Dismiss or in the Alternative to Stay. (*Id*. ¶¶ 10-12.) The result

17  of these efforts by Plaintiff's counsel, Defendant's counsel, and the mediator is a favorable deal

18  that reflects optimal relief for the Settlement Class.

19      **1.    The Plaintiff's Claims and The Litigation History**

20      Plaintiff received text messages from a Telenav phone number[4] after he texted "STOP" in

21  response. Plaintiff contacted his counsel about his legal rights when he couldn't opt-out.

22      Prior to filing this case, Settlement Class Counsel undertook an investigation into

23  Telenav, the Scout App, and the app's text messaging platform. (Woodrow Decl. ¶¶ 3-4.) Class

24  Counsel worked closely with Plaintiff to determine the extent of the intrusive text messages sent

25  to his cellphone. (*Id*. ¶ 4.) Class Counsel reviewed public information regarding the inner

---

26  [3] Telenav denies that any persons would be entitled to relief absent the Settlement Agreement.

27  [4] Telenav disputes that it was the "maker" of any of the text messages, though it concedes that

28  messages were sent using a Telenav short-code or long-code.

1   workings of geolocation apps to assess their functionality. (*Id.* 3) Following this research, the

2   pleadings were prepared and filed as a class action on behalf of Plaintiff and all other cellphone

3   users who received similar text messages from Telenav as well as on behalf of persons who had

4   received such text messages following their submission of a STOP or similar text. (*Id.* ¶ 5.)

5          On July 28, 2016, Plaintiff filed his initial class action complaint in the United States

6   District Court for the Northern District of California against Telenav. (*See* Dkt. 1.) Specifically,

7   the Complaint alleged that Telenav violated the TCPA by sending text messages using an

8   automatic dialer without Plaintiff's prior express written consent—and after Plaintiff and others

9   had submitted at least one STOP request—and sought statutory damages and injunctive relief on

10  behalf of a nationwide class. (*Id.*)

11         Following the filing of the initial Complaint the counsel for the Parties engaged in

12  discussions regarding their respective views of the case. (Woodrow Decl. ¶ 7.) Telenav first

13  retained the law firm Turner Boyd LLP. (*Id.*) Counsel, thereafter, engaged in meaningful

14  discussions regarding the details of the case and the potential for an early resolution. In or around

15  October 2016, Tonia Ouellette Klausner and Peter Holm of Wilson Sonsini Goodrich & Rosati,

16  PC, experienced TCPA defense counsel, appeared and took over the litigation and settlement

17  discussions. (*Id.* ¶ 8.) Counsel for the Parties continued the productive discussions that had

18  begun with Telenav's prior lawyers. Counsel agreed to exchange data regarding the scope of the

19  litigation—including information regarding the size of the alleged class and the technological

20  issues affecting the Scout App's messaging platform (powered by Twilio, Inc.) that may have

21  prevented Telenav's system from honoring STOP requests. (*Id.*) Using this information, Class

22  Counsel were able to assess their likelihood of success and value the claims. (*Id.*) This included a

23  frank dialogue regarding Telenav's defenses, including, *inter alia*, arguments that Telenav did

24  not send the text messages, and that its text messaging system doesn't qualify as an ATDS. (*Id.*)

25              **2.      The Mediation and Settlement History.**

26         Following initial informal discovery, counsel for the Parties agreed that the case should

27  go to mediation. (Woodrow Decl. ¶ 9.) Telenav also moved to dismiss the case or in the

28

1   alternative to stay the matter pending a decision by the D.C. Circuit Court of Appeals in *ACA*

2   *International*, which the Parties briefed in full.

3       On July 7, 2017, counsel for the Parties engaged in a full-day mediation session in San

4   Francisco, California conducted by John Bates of JAMS, a well-respected mediator with

5   substantial experience settling complex TCPA class actions, among other complex cases.

6   (Woodrow Decl. ¶ 9.) Lawyers for Telenav's insurer attended as well. (*Id.*) Through the

7   mediation process, the Parties were able to exchange additional, updated information regarding

8   the size and scope of the proposed class and Telenav's anticipated defenses. (*Id.* ¶ 10.) Despite a

9   productive negotiation, the Parties were unable to reach an agreement in principle regarding the

10  relief to be made available to the Class prior to the close of the mediation session. (*Id.*) Instead,

11  the Parties agreed to proceed with the hearing on Telenav's Motion to Dismiss or Stay that had

12  been scheduled before the Parties had agreed to mediate, wherein Telenav had argued both that:

13  (1) the case should be dismissed because, according to Telenav, it was not the "maker" of the

14  calls, and (2) in the alternative, the case should be stayed pending the D.C. Circuit Court of

15  Appeals' consideration of the FCC's definition of an automatic telephone dialing system under

16  the TCPA in *ACA International v. FCC*, Appeal No. 15-1211. (*Id.*) The Parties also agreed that

17  they would continue their discussions to determine whether a resolution was possible. (*Id.* ¶ 10.)

18      Meanwhile, the mediator, Mr. Bates worked to keep the case on a settlement track by

19  engaging the Parties through series of telephone negotiations. (Woodrow Decl. ¶ 12.) The instant

20  Settlement is the result of this back-and-forth. (*Id.* ¶ 13.) The night before the hearing on the

21  Motion to Dismiss, counsel reached an agreement and informed the Court the next day at the start

22  of oral argument. Only after an agreement in principal was reached with respect to the Settlement

23  Class did the Parties discuss an amount to be requested for reasonable attorneys' fees for proposed

24  Class Counsel or an incentive award for Named Plaintiff Gergetz. (*Id.*)

25      Class Counsel then worked with defense counsel to memorialize the Settlement and to

26  draft and revise all pertinent Settlement documents. This included drafting and editing the

27  Agreement, the claim form, the long form, short form, and email notices, as well as all proposed

28  orders. Class Counsel also worked with the Settlement Administrator on the Settlement Website,

1   including the Q&A sections, interactive voice recording (IVR) messaging, and other settlement

2   materials. (Woodrow Decl. ¶ 18.) And since Notice was disseminated to the Class, Class Counsel

3   has worked to respond to Class Member inquiries and to assist and encourage the filing of claims.

4   (*Id.* ¶ 20.)

5        The outcome is a particularly strong Settlement, the key terms of which are set forth

6   below.

7   **III.    KEY TERMS OF THE SETTLEMENT AGREEMENT**

8        The precise terms of the Settlement are attached hereto in the Settlement Agreement (*See*

9   Settlement Agreement ("Settlement Agrmt."), attached hereto as Ex. C.) A brief summary of the

10  essential terms follows.

11       **A.    Class Definition**

12       The "Settlement Class" or "Class" is defined as any Person who falls within one or both

13  of the Subclasses below:

14       The "No Consent Subclass": All persons in the United States who during the
         Class Period received at least one Download the Scout App Text Message; and/or

15

16       The "Stop Subclass": All persons in the United States who during the Class
         Period received at least one additional message other than a message confirming
         an opt out request, after replying STOP, QUIT, END, CANCEL or

17       UNSUBSCRIBE to any text message received from any Telenav Number.

18  (Dkt No. 65-1, Settlement Agreement, Ex. C, § II, ¶ 35.)[5] Settlement Class Members may belong

19  to both Subclasses.

20       **B.    Monetary Relief**

21       The Settlement provides Settlement Class Members who file claims with substantial

22  monetary relief.  Specifically, Defendant has agreed to establish a Settlement Fund of three

23  million five-hundred thousand dollars ($3,500,000.00 USD) total ("Settlement Fund"). The

24  Settlement Fund will be used to pay all approved claims, Settlement Administration Expenses,

25  any Incentive Award, and any Fee Award. Settlement Administration Expenses, any Incentive

26  Award, and any Fee Award will be subtracted from the Settlement Fund. The amount that

27

28  [5] Capitalized terms herein have the same meaning as set forth in the Settlement Agreement.

1   remains, the Net Settlement Fund, will then be divided by the total number of Award Units.

2   Members of the No Consent Subclass are entitled to receive one (1) Award Unit, while members

3   of the Stop Subclass are entitled to receive five (5) Award Units (members of both subclasses are

4   entitled to receive a total of six (6) Award Units). Award Units will be of equal value up to a

5   maximum of $1,500 per Award Unit. Any monies remaining in the Settlement Fund would be

6   donated to the *Cy Pres* Recipient. As indicated above, based on the current number of claims

7   filed, it is expected that each Award Unit will be worth approximately $960.[6]

8        **C.      Release of Liability**

9        In exchange for the relief described above, Telenav and its related and affiliated entities

10  and persons will receive a full release of any claims relating to the sending of the Download the

11  Scout App Text Messages, or to the sending of at least one additional text message other than a

12  message confirming an opt-out request to any person who had replied STOP, QUIT, END,

13  CANCEL or UNSUBSCRIBE to any text message received from a Telenav Number, in either

14  case during the Class Period. (Settlement Agrmt. §V.).

15       **D.      Notice and Administrative Expenses**

16       The Settlement requires that all costs associated with disseminating notice in accordance

17  with the Notice Plan to the Settlement Class, as well as for all other administrative expenses, to

18  be deducted from the $3,500,000 Settlement Fund. (Settlement Agrmt. ¶ 31.)

19       **E.      Class Representative Incentive Award**

20       In recognition of his service to the Settlement Class and in stepping forward to help secure

21  the relief obtained via the instant Settlement, the Settlement permits a request for the Named

22  Plaintiff/Class Representative, Nathan Gergetz, to receive an Incentive Award not to exceed

23  $5,000. (Settlement Agrmt. § VI.2.)

24       **F.      Reasonable Attorneys' Fees and Expenses**

25       The Settlement further provides that Class Counsel may seek attorneys' fees of up to

26  $1,155,000 as compensation for their work in obtaining the relief secured by the Settlement.

27  _____

28  [6] While additional claims are expected, this is not expected to materially change the calculation or award payout.

1  (Settlement Agrmt. § VI.1.) Settlement Class Counsel filed their Motion for Award of Reasonable

2  Attorneys' Fees and Expenses, and Incentive Award on August 2, 2018 in which they

3  substantiated their fees and expenses in the litigation. (Dkt. 73.)

4       Such terms are undeniably fair, reasonable, and adequate for the Settlement Class.

5  Accordingly, the Court should grant final approval.

6  **IV.  THE NOTICE COMPORTS WITH DUE PROCESS**

7       Before granting final approval of this Settlement, the Court is obligated to determine

8  whether the notice provided to the Settlement Class is "the best notice that is practicable under

9  the circumstances, including individual notice to all members who can be identified through

10  reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S.

11  156, 173 (1974); *see also Silber v. Mabon,* 18 F.3d 1449, 1454 (9th Cir. 1994). Such safeguards

12  ensure that notice to the class complies with both Rule 23 and the demands of due process.

13  *Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010). Adherence to these standards does not

14  require that every individual class member receive *actual* notice—due process mandates only

15  that the notice be "reasonably calculated under the circumstances to apprise [class members] of

16  the pendency of the class action and give [them] a chance to be heard." *Ross v. Trex Co., Inc.*,

17  No. 09-CV-00670, 2013 WL 791229, at *1 (N.D. Cal. Mar. 4, 2013). A notice plan that reaches

18  at least 70% of the class is reasonable. FEDERAL JUDICIAL CENTER, *Judges' Class Action Notice*

19  *and Claims Process Checklist and Plain Language Guide* 3 (2010).

20       As for content, a class notice is satisfactory where it "generally describes the terms of the

21  settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

22  forward and be heard." *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980)

23  *disapproved of on other grounds by Evans v. Jeff D.*, 475 U.S. 717, 106 S. Ct. 1531, 89 L. Ed. 2d

24  747 (1986); *see also* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:53 at

25  167 (4th ed. 2002) (notice is "adequate if it may be understood by the average class member.").

26  The notice must set forth the nature of the action, define the class to be certified, identify the

27  class claims and defenses at issue, and explain to class members that they may enter an

28  appearance through counsel if so desired, that they may request exclusion, and that any judgment

1   will be binding on all class members. *See* Fed. R. Civ. P. 23(c)(2)(B).

2          Following preliminary approval, the Parties, with the assistance of professional

3   settlement administrator Epiq Systems, faithfully adhered to the requirements of the Settlement,

4   Rule 23, Due Process, and this Court's Order by constructing and implementing a Notice Plan

5   that included direct mail notice to all Settlement Class Members for whom an address could be

6   located. (*See* Declaration of Cameron Azari, ("Azari Decl.") attached as Ex. D, ¶¶ 12-14.) To

7   establish the identity of Class Members and ensure that direct mail was especially effective,

8   Telenav provided the Administrator with lists of cellular telephone numbers corresponding to the

9   Settlement Class Members. (*Id.* ¶ 15.) From there, Epiq was able to use a combination of reverse

10  cell phone look-up searches to send postcard and email notices to at least 145,984 members of

11  the Settlement Class. (*Id.* ¶¶ 17, 20.) This notice proved especially effective, resulting in a rate of

12  79.1% of Settlement Class Members receiving direct notice (and reached 95.5% of all Settlement

13  Class Members for whom an address could be located). (*Id.* ¶ 15.) The Notice was further

14  disseminated through the use of internet banner advertisements. (*Id.* ¶¶ 23-24.) And in

15  compliance with the Agreement and the Class Action Fairness Act ("CAFA"), 28 U.S.C. §

16  1715(b), Telenav caused to be mailed a letter enclosing the requisite court documents to the U.S.

17  Attorney General and the Attorneys General of each state and U.S. territory. (*See* Declaration of

18  Tonia Ouellette Klausner, Dkt. 74.)

19         The direct mail notice apprised Settlement Class Members of the existence of the

20  Settlement Website, which hosted the "Long Form" notice approved by the Court, provided

21  complete details regarding the rights of Class Members to object to or opt-out of the Settlement,

22  and allowed Settlement Class Members to file claims electronically. All told, the Notice Plan

23  achieved its projected saturation through direct notice supplemented with internet advertising,

24  and, in the Settlement Administrator's opinion, comports with due process. (Azari Decl. ¶¶ 35-

25  38.)

26         Shortly following the date the short form Notice was mailed out to the Settlement Class

27  Members, the Parties began receiving weekly reports from the Settlement Administrator. The

28  numbers were suggestive of a lack of engagement on behalf of the Settlement Class—which was

1   somewhat perplexing given the strength of the relief offered. To address this issue, Settlement

2   Class Counsel's law firm obtained the list of cellphone numbers from the Settlement

3   Administrator and began calling Settlement Class Members to inform them of their legal rights

4   under the agreement. (Woodrow Decl. ¶ 21.)

5          The Settlement also featured the creation and maintenance of a Settlement Website

6   (telenavtcpasettlement.com) which was used by Class Members to submit claims electronically.

7   The website was viewed by over 120,000 unique visitors (Azari Dec. ¶¶ 25-27.)

8          Finally, in addition to implementing the methods of notice that resulted in reaching the

9   greatest number of Class Members possible, the content of the notice used simple, plain language

10  encouraging readership and comprehension. (*See* Attachments 2-6 to Azari Decl.) In sum, notice

11  to the Class complied with the Court's Preliminary Approval Order, Rule 23, and Due Process

12  and plainly comprised the "best practicable notice under the circumstances."

13  **V.     THE SETTLEMENT WARRANTS FINAL APPROVAL**

14         Rule 23(e) provides that a class action shall not be dismissed or compromised without the

15  approval of the court. Fed. R. Civ. P. 23(e); *see also Wren v. RGIS Inventory Specialists*, No. 06-

16  CV-05778, 2011 WL 1230826, at *6 (N.D. Cal. Apr. 1, 2011).  Having already determined that

17  the settlement warrants preliminary approval, the final step in the approval process requires the

18  Court to make a final fairness determination. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,

19  221 F.R.D. 523, 525 (C.D. Cal. 2004) (citing Manual for Complex Litigation, Third, § 30.41, at

20  236-37 (1995)). At this second, final approval stage, the Court's analysis focuses on whether the

21  proposed class action settlement "is fundamentally fair, adequate, and reasonable." *Officers for*

22  *Justice v. Civil Serv. Comm'n of City and Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982), *cert.*

23  *denied*, 459 U.S. 1217 (1983). A settlement typically meets these criteria where "the interests of

24  the class are better served by the settlement than by further litigation." *Garner v. State Farm*

25  *Mut. Auto Ins. Co.*, No. 08-CV-1365, 2010 WL 1687832, at *8 (N.D. Cal. Apr. 22, 2010)

26  (quoting Manual for Complex Litigation, Fourth § 21.61 (2004)). The decision to approve or

27  reject the settlement rests soundly with the trial judge, though courts should give proper

28  deference "to the private consensual decision of the parties." *Garner*, 2010 WL 1687832, at *8

1   ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated

2   resolution. . . .") (citing *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009)). In

3   general though, the Ninth Circuit has recognized that there is a "strong judicial policy that favors

4   settlement, particularly where complex class action litigation is concerned." *Class Plaintiffs v.*

5   *City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992).

6        In determining if a settlement should be finally approved the trial court examines: "(1)

7   the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of

8   further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the

9   amount offered in settlement; (5) the extent of discovery completed and the stage of the

10  proceedings; (6) the experience and views of counsel; (7) the presence of a governmental

11  participant; and (8) the reaction of the class members to the proposed settlement." *Churchill Vill,*

12  *L.L.C. v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler Corp.,* 150

13  F.3d 1011, 1026 (9th Cir. 1998)); *see also Lane v. Facebook, Inc.,* 696 F.3d 811, 819 (9th Cir.

14  2012). No one factor carries more weight than others, and the importance of each factor will

15  depend on "the unique facts and circumstances presented by each individual case." *Officers for*

16  *Justice*, 688 F.2d at 625. Moreover, in the Ninth Circuit, "[s]ettlements are afforded a

17  presumption of fairness if (1) the negotiations occurred at arm's length; (2) there was sufficient

18  discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only

19  a small fraction of the class objected." *Schiller v. David's Bridal, Inc.*, No. 10-CV-00616, 2012

20  WL 2117001, at *10 (E.D. Cal. June 11, 2012), *report and recommendation adopted* June 28,

21  2012 (citing 4 William B. Rubenstein, Alba Conte, & Herbert B. Newberg, *Newberg on Class*

22  *Actions* § 11.41 (4th ed. West 2011)).

23        As set forth below, each of these considerations weighs in favor of approval.

24        **A.    The Strength of Plaintiff Gergetz's Case.**

25        The first factor analyzes the strength of the plaintiff's case, which requires a balancing of

26  the "likelihood of success on the merits and the range of possible recovery." *Garner*, 2010 WL

27  1687832, at *9; *see also Shames v. Hertz Corp.*, No. 07-CV-2174, 2012 WL 5392159, at *5

28  (S.D. Cal. Nov. 5, 2012) (this analysis requires balancing "the vagaries of litigation and [] the

1   significance of immediate recovery by way of the compromise to the mere possibility of relief in

2   the future, after protracted and expensive litigation.") (citing *Nat'l Rural Telecomms. Coop.*, 221

3   F.R.D. at 526). This does not require the Court to conduct a "speculative measure of what might

4   have been awarded in a judgment in favor of the class," or "reach any ultimate conclusions on

5   the contested issues of fact and law which underlie the merits of the dispute, for it is the very

6   uncertainty of outcome in litigation and avoidance of wastefulness and expensive litigation that

7   induce consensual settlements." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D at 526 (citations

8   omitted). Additionally, "the Court may presume that through negotiation, the Parties, counsel,

9   and mediator arrived at a reasonable range of settlement by considering Plaintiff[s'] likelihood of

10   recovery." *Garner*, 2010 WL 1687832, at *9 (citing *Rodriguez*, 563 F.3d at 965).

11       Plaintiff and Class Counsel are confident in the strength of their claims and believe that if

12   the case were to proceed to summary judgment or to trial, they would likely succeed on the

13   merits. Further, if Plaintiff were to succeed at trial the potential recovery for the Class would be

14   significant. Given that the TCPA provides for $500 in damages (potentially trebled) for each

15   violation and the fact that there are approximately 200,000 Class Members who received

16   multiple text messages each, the potential recovery totaled hundreds of millions (if not billions)

17   of dollars[7]—an amount that could be considered punitive and potentially subject to other

18   defenses. *See* 47 U.S.C. § 227(b)(3)(B). That said, cases involving similar facts supported

19   Plaintiff's chance of succeeding in both adversarial class certification and at summary judgment.

20   *See Lee v. Stonebridge Life Ins. Co.,* No. 11-CV-0043 RS, 2013 WL 542854, at *4 (N.D. Cal.

21   Feb. 12, 2013) (certifying a nationwide class in a TCPA text message action); *see also Agne v.*

22   *Papa John's Int'l, Inc.*, 286 F.R.D. 559, 572 (W.D. Wash. 2012) (certifying both a national and

23   state subclass in a TCPA text message action); *see also Griffith v. Consumer Portfolio Serv.,*

24   *Inc.*, 838 F. Supp. 2d 723, 727-28 (N.D. Ill. 2011) (denying defendant's motion for summary

25   judgment); *see also Bridgeview Heath Care Ctr. Ltd. v. Clark*, 2011 WL 4585028, at *6 (N.D.

26

27   [7] For illustrative purposes, assuming each of the 200,000 Class Members received just one (1)
     message each that was proven to violate the TCPA, the statutory damages would range from
28   $100,000,000 to $300,000,000.

1    Ill. Sept. 30, 2011) (same).

2          Nonetheless, Telenav repeatedly argued that it would either defeat class certification or

3    that it would ultimately prevail on the merits due to a variety of defenses, including that the

4    equipment it used does not qualify as an ATDS, that it wasn't the maker of the calls, and other

5    asserted defenses. While Plaintiff is confident, not all TCPA class actions succeed and cases

6    support Telenav's position as well. *See, e.g.*, *Dominguez v. Yahoo, Inc.*, 894 F.3d. 116 (3d Cir.

7    2018) (affirming summary judgment to defendant finding Yahoo's system did not qualify as an

8    ATDS); *see also Cour v. Life360, Inc.*, No. 16-cv-00805-TEH, 2016 U.S. Dist. LEXIS 98945, at

9    *13 (N.D. Cal. July 28, 2016) (user of mobile app and not app provider responsible for making

10   text message calls facilitated by app); *see also Gene and Gene, LLC v. Biopay LLC,* 541 F.3d

11   318, 327 (5th Cir. 2008) (stating that the predominant issue in a TCPA case "is undoubtedly one

12   of *individual* consent"). Considering that several of these issues remain untested, coupled with

13   the somewhat evolving definition of an ATDS under the TCPA, the case was strong but notably

14   imperfect.

15         Given the defense Telenav was prepared to mount through experienced counsel as well as

16   the additional hurdles presented at class certification, a compromise benefitting both the Plaintiff

17   and the Class represents a reasonable conclusion to this litigation. *See Bellows v. NCO Fin. Sys.,*

18   *Inc.*, No. 07-CV-01413, 2008 WL 5458986, at *7 (S.D. Cal. Dec. 10, 2008) (noting that "the

19   very essence of a settlement agreement is compromise, 'a yielding of absolutes and an

20   abandoning of highest hopes' . . . in exchange for the saving of cost and elimination of risk, the

21   parties each give up something they might have won had they proceeded with litigation.") (citing

22   and quoting *Officers for Justice*, 688 F.2d at 624.). And, considering the complexity of the issues

23   still to be litigated as well as the very real potential that Defendant's success could completely

24   deprive the Plaintiff and Class of any relief whatsoever, the instant Settlement achieves a

25   compromise that recognizes both the strengths and weaknesses of Plaintiff's claims. *See Martin*

26   *v. AmeriPride Servs., Inc.*, No. 08-CV-440, 2011 WL 2313604, at *6 (S.D. Cal. June 9, 2011)

27   (instructing courts to determine "whether the decision to settle is a good value for a relatively

28   weak case or a sell-out of an extraordinarily strong case."). Given the strength of Plaintiff's

1    claims, this factor favors Settlement approval.

2    **B.**      **The Risk, Expense, Complexity, and Duration of Further Litigation.**

3    The second factor courts may consider is "the risk, expense, complexity, and likely

4 duration of further litigation." *Churchill Vill.,* 361 F.3d at 575. This requires a balancing of the

5 "risk of continued litigation . . . against the certainty and immediacy of recovery from the

6 Settlement." *In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) (citing

7 *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)). When considering the

8 immediate recovery provided by a fair settlement versus the uncertainty of continued litigation,

9 "it has been held proper to take the bird in hand instead of a prospective flock in the bush." *Kim*

10 *v. Space Pencil, Inc.*, No. 11-CV-03796, 2012 WL 5948951, at *5 (N.D. Cal. Nov. 28, 2012)

11 (quoting *Lipuma v. Am. Express Co.,* 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005)). And, as

12 indicated above, where several significant procedural hurdles yet remain, including anticipated

13 summary judgment motions, adversarial class certification, and the possibility of appeals, these

14 considerations favor approval of the settlement under this factor. *See Garner*, 2010 WL 1687832,

15 at *10 (citing *Rodriguez*, 563 F.3d at 966).

16    The expense, duration, and complexity of any protracted litigation certain to occur in the

17 absence of this Settlement would be substantial, and significant labor and expenses would be

18 expended on both sides in advance of class certification, summary judgment, expert witness

19 discovery, and the briefing and arguing of a number of discovery motions, pre-trial motions, and

20 evidentiary motions. Further, should this matter proceed to trial, the Parties would necessarily

21 incur the expenses involved in months of preparation and the calling of witnesses and experts,

22 potentially from across the country. *See Young v. Polo Retail, LLC*, 02-CV-4546, 2007 WL

23 951821, at *3 (N.D. Cal. Mar. 28, 2007). Given the potential for a statutory award totaling over

24 one hundred million dollars, the losing party would appeal the decision as a matter of course,

25 resulting in the expenditure of even more time and money. In light of these expenses and the

26 inherent risk involved in any continued litigation, this factor weighs in favor of approval.

27    **C.**      **The Risk of Maintaining Class Action Status.**

28    Exacerbating the inherent risk of pursuing and litigating the merits of this case is the

unavoidable risk attendant to seeking adversarial class certification and then maintaining class status throughout the remainder of the litigation. This is especially true given that "[a] district court may decertify a class at any time." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (citing *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160 (1982)). Courts will consider this factor even where a settlement has been reached prior to a motion for class certification, given that pre-certification concerns validate the risk both parties face should plaintiffs succeed or fail in certifying the class. *See Gardner v. GC Servs., LP*, No. 10-CV-0997, 2012 WL 1119534, at *4 (S.D. Cal. Apr. 2, 2012) (recognizing the risk certification poses for both parties and the benefits of settlement).

In this case the Court's Preliminary Approval Order certified a nationwide class for settlement purposes only. (Dkt. 70.) Thus, in absence of this Settlement, Plaintiff would first face a highly contested motion for class certification. Even if he were to succeed, Gergetz would then run the risk of maintaining certification in the face of Defendant's ability to move at any time to decertify the Class. While Class Counsel is confident that given the uniform nature of Defendant's alleged conduct toward the Class, certification would be proper—after all, the key issues with regard to Defendant's conduct are common ones: (1) whether Defendant sent text messages without permission, (2) whether messages were sent after people responded "STOP," (3) whether responding "STOP" is sufficient to revoke consent, (4) whether Telenav made the calls and whether they were for telemarketing purposes, (5) whether the equipment used to send such text messages falls under the statutory definition of an "automatic telephone dialing system," (6) and whether Defendants' conduct violated the TCPA. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 2556 (2011) (explaining that commonality is found where the claims of all class members "depend upon a common contention," and "[e]ven a single [common] question will do") (modifications in original, internal quotations omitted). Yet, even though significant authority exists favoring the certification of TCPA class actions under similar facts, *Lee*, 2013 WL 542854, at *4, *Agne*, 268 F.R.D. at 572, there is always the very real possibility of the denial or decertification of the class as well. As such, the Court should find the decision to settle at this stage a reasonable one and supportive of the fairness of the Settlement.

1

**D.     The Amount Offered in Settlement.**

2      The next factor utilized in determining the overall fairness of a settlement requires the

3  Court to compare the actual settlement amount to the parties' estimates of the amount of

4  damages that would have been recovered if the action were to be successfully litigated at trial.

5  *Martin*, 2011 WL 2313604, at *6. In considering the ultimate potential recovery however, courts

6  are instructed to be mindful of the perils faced along the way. *See Garner*, 2010 WL 1687832, at

7  *11 (noting that "'even where the total settlement fund is small,' it may not be 'unreasonable in

8  light of the perils plaintiffs face in obtaining a meaningful recovery on their claims'") (citing *In*

9  *re Critical Path, Inc.,* No. 01-CV-00551, 2002 WL 32627559, at *7 (N.D. Cal. June 18, 2002));

10  *accord Jaffe v. Morgan Stanley & Co.,* No. 06-CV-3903, 2008 WL 346417, at *9 (N.D. Cal.

11  Feb.7, 2008) ("[t]he settlement amount could undoubtedly be greater, but it is not obviously

12  deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties,

13  risks, and costs that come with litigating a case to trial"); *see also Hanlon v. Chrysler Corp.,* 150

14  F.3d 1011, 1027 (9th Cir. 1998) (holding that the possibility "that the settlement could have been

15  better ... does not mean the settlement presented was not fair, reasonable or adequate"). This

16  factor is further strengthened where the settlement is "proposed after protracted arms-length and

17  adversarial negotiation, during which time an experienced impartial mediator helped the Parties

18  arrive at a compromise amount that both Parties find satisfactory." *Garner*, 2010 WL 1687832,

19  at *11.

20      This Settlement establishes a $3,500,000 Settlement Fund from which claimants are

21  currently positioned to receive hundreds of dollars each, if not more.[8] This amount was secured

22  with the help of an experienced third-party neutral, Mr. John Bates of JAMS. Where, as is the

23  case here, the class members' claims involve statutory damages, the court is not required to find

24  "a specific monetary value corresponding to each of the plaintiff class's statutory claims and

25  compare the value of those claims to the proffered settlement award." *Lane,* 696 F.3d at 823.

26  And though it seems axiomatic, the payment of a cash settlement to the class "is a good indicator

27

28  _____
[8] Again, total potential liability extended at least into the hundreds of millions.

1  of a beneficial settlement." *See Rodriguez*, 563 F.3d at 965.

2      The results here are outstanding and exceed the amounts per settlement class member

3  often available in TCPA settlements, which have included:

| Case name | Amount per Claimant |
| --- | --- |
| *Rose v. Bank of Am. Corp.*, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014) | $20.00 to $40.00 |
| *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, 11-md-2261 (S.D. Cal.) | $12.97; or, $17.29 voucher |
| *Kazemi v. Payless Shoesource, Inc.*, 09- cv-5142 (N.D. Cal.) | $25.00 voucher |
| *In re Capital One Telephone Consumer Protection Act Litigation*, 12 C 10064 MDL No. 2416 (N.D. Ill. 2015) | $34.60 |
| *Steinfeld v. Discover Financial Services*, 12-cv-1118 JSW (N.D. Cal.) | $48.69 |
| *Bellows v. NCO Fin. Sys.*, 2008 U.S. Dist. LEXIS 13525 (S.D. Cal. 2008) | $70.00 |
| *Malta v. Fed. Home Loan Mortg. Corp.*, 10-cv-1290 BEN (S.D. Cal.) | $84.82 |
| *Wilkins, et al. v. HSBC Bank Nevada, N.A.*, 14 C 190 (N.D. Ill.) | $102.62 |
| *Gutierrez v. Barclays Grp.*, 10-cv-1012 (S.D. Cal.) | $100.00 |
| *Robles v. Lucky Brand Dungarees, Inc.*, 10-cv-4846-MMC (N.D. Cal.) | $100.00 |
| *Kramer v. B2Mobile*, 10-cv-2722 CW (N.D. Cal.) | $100.00 |
| *Lanza v. Upscale Events by Mosaic, LLC*, 13-cv-80093 DMM (S.D. Fla.) | $150.00 |
| *Ellison v. Steven Madden, Ltd.*, 11-cv-5935 (C.D. Cal.) | $150.00 |

| | |
|---|---|
| *Bayat v. Bank of the West*, C 13-2376 EMC (N.D. Cal.) | $151.00 |
| *Weinstein v. The Timberland Co., et al.*, 06-cv-454 (N.D. Ill.) | $150.00 |
| *Satterfield v. Simon & Schuster, Inc.*, 06-cv-2893 (N.D. Cal.) | $175.00 |
| *Rojas v. Career Education Corporation*, 10-cv-5260 (N.D. Ill.) | $200.00 |
| *Lozano v. Twentieth Century Fox Film Corp.*, 09-cv-6344 (N.D. Ill.) | $200.00 |

The instant Settlement is more than reasonable in light of these other settlements under the TCPA that have been approved as fair, reasonable, and adequate. *See In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 789 (N.D. Ill. 2015) (discussing range of acceptable TCPA class settlements based on per claimant recovery, approving $34.60 per claiming member); *see also Rose v. Bank of Am. Corp.*, Case No.: 5:11-CV-02390-EJD; 5:12-CV-04009-EJD, 2014 WL 4273358, at *10 (N.D. Cal. Aug. 29, 2014) (discussing range of acceptable TCPA settlements and approving $20.00 to $40.00 per claimant). Put simply, cash payments ranging from $960 to $5,744 far exceed the relief obtained by these other industry settlements.

Further, the valuation of the Settlement does not take into consideration the fact that Telenav made changes following the lawsuit to ensure that STOP requests are properly processed. When this additional change is considered, it is obvious that this litigation and resulting Settlement represents a demonstrably fair, reasonable, and adequate recovery.

**E.    The Extent of Discovery Completed and the Stage of Litigation.**

Next, the Court may consider both "[t]he extent of the discovery conducted to date and the stage of the litigation" as indicators of class counsel's familiarity with the case and ability to make informed decisions. *OmniVision*, 559 F. Supp. 2d at 1042 (citing *In re Mego Fin. Corp.*, 213 F. 3d at 459). There exists no specific stage of the proceedings, nor quantity of information

1    gleaned from discovery, that automatically tips this factor in favor of settlement. Instead, "as

2    long as the parties have sufficient information to make an informed decision about settlement,

3    formal discovery is not a necessary ticket to the bargaining table." *Gardner*, 2012 WL 1119534,

4    at *5 (quoting *Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1239 (9th Cir. 1998)). Courts

5    routinely find this factor satisfied even in cases that have not progressed beyond the pleadings

6    stage, or where little or no formal discovery has been conducted. *See, e.g.*, *In re Patriot Am.*

7    *Hospitality Inc. Sec. Litig.*, MDL 00-1300, 2005 WL 3801594, at *2 (N.D. Cal. Nov. 30, 2005)

8    (finding this factor satisfied and granting approval even where the case had not proceeded

9    beyond the pleading stage and no formal discovery had taken place); *see also Odrick v.*

10   *UnionBancal Corp.*, No. 10-CV-5565, 2012 WL 6019495, at *4 (N.D. Cal. Dec. 3, 2012)

11   (approving settlement reached at the early stages of litigation and where little discovery was

12   conducted).

13          Ultimately, all that is required is that the parties demonstrate a "clear view of the

14   strengths and weaknesses of their cases." *Bellows*, 2008 WL 5458986, at *8 (quotation omitted).

15   And where the parties demonstrate an understanding of the legal and factual issues at play, "[a]n

16   initial presumption of fairness is usually involved if the settlement is recommended by class

17   counsel after arm's-length bargaining." *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at *8

18   (N.D. Cal. Apr. 29, 2011) (citations omitted).

19          Applied here, the stage of the litigation has allowed for a meaningful amount of informal

20   discovery and negotiations necessary to achieve the instant Settlement. After Gergetz filed his

21   initial complaint, the Parties engaged in frank settlement discussions that included the disclosure

22   of relevant information regarding the size and scope of the Class (broken down by subclasses)

23   that would aid in negotiations. (*See* Woodrow Decl. ¶ 8.) This data, coupled with information

24   regarding the nature of the issue that supposedly resulted in un-honored "STOP" requests, gave

25   Class Counsel the information needed to properly value the claims. Additional information was

26   thereafter obtained through the mediation process and by Order of this Court. As such, the

27   Parties had sufficient information, and the proceedings were sufficiently advanced.

28          **F.      The Experience and Views of Counsel.**

1    The next factor warranting consideration is counsel's experience and its own views about

2  the adequacy of the Settlement. *Garner*, 2010 WL 1687832, at \*14. As a general matter "[t]he

3  recommendations of plaintiffs' counsel should be given a presumption of reasonableness."

4  *OmniVision*, 559 F. Supp. 2d at 1043 (citing *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D.

5  Cal. 1979)). This presumption applies to settlements negotiated by experienced counsel given

6  that "[p]arties represented by competent counsel are better positioned than courts to produce a

7  settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec.*

8  *Litig.,* 47 F.3d 373, 378 (9th Cir. 1995). This factor is strengthened when class counsel has

9  experience in the claims being litigated. *See Martin,* 2011 WL 2313604, at \*7; *see also Nat'l*

10  *Rural Telecomms. Coop.,* 221 F.R.D. at 528 ("[g]reat weight is accorded to the recommendation

11  of counsel, who are most closely acquainted with the facts of the underlying litigation.").

12    Such a presumption is appropriate here given that Class Counsel specialize in the

13  litigation of consumer class actions of similar size and complexity, and have litigated and settled

14  numerous TCPA text-messaging class actions. (Woodrow Decl. ¶ 24; *see also* Class Counsels'

15  Firm Resumes, which can be found at Dkt. 73-1.) This experience and familiarity steered Class

16  Counsel's efforts throughout this litigation and was a critical factor in obtaining the relief

17  embodied by the Settlement, as well as ensuring that the Class received the highest quality of

18  representation.

19    This factor is not limited only to the caliber of Class Counsel, however. Class Counsel

20  were pitted against highly experienced defense counsel from a top-tier national defense firm,

21  who were joined by counsel for Defendant's insurer. Given such experience, it was only through

22  extensive negotiations and a formal mediation that the Parties were able to reach this Settlement.

23  Faced with the prospect of receiving nothing should Defendant succeed in any aspect of its

24  defense, Class Counsel are confident that the Settlement Fund, which it anticipates will provide

25  over hundreds of dollars to each Settlement Class Member (and in some cases over $5,000),

26  represents an exceptional result in this litigation. This factor, therefore, also weighs in favor of

27  final approval of the Settlement.

28    **G.    The Presence of a Governmental Participant.**

1   No governmental agency intervened or otherwise participated in this lawsuit. Some

2   courts hold that such a result means that this factor does not apply to the Court's analysis. *See*

3   *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528. Thus, this factor is either neutral, or, if

4   considered, favors final approval as there is no governmental actor working for the Class.[9]

5       **H.      The Reaction of Class Members to Date.**

6       The deadline for Class Members to object to or opt-out of the Settlement was set for

7   August 16, 2018. All told, no individual has requested exclusion and no Class Members have

8   objected. This absolute absence of objections provides strong evidence of favorability and

9   demonstrates the strength and reasonableness of the Settlement. *See e.g. Churchill Vill.,* 361 F.3d

10  at 577; *see also In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 459 (9th Cir. 2000) (one

11  objection out of a potential class of 5,400); *see also Chun-Hoon v. McKee Foods Corp.*, 716 F.

12  Supp. 2d 848, 852 (N.D. Cal. 2010) (zero objections and sixteen opt-outs out of a class of 329

13  members). While the claims rate was admittedly lower than anticipated, (typical take rates range

14  from 3% - 5%)[10], this has resulted in greater benefits to those Settlement Class Members who

15  chose to file claims. These results, specifically the lack of opposition to the Settlement, favor a

16  finding of reasonableness and warrant final approval.

17      **I.      There is No Evidence of Collusion and Other Red Flags.**

18      In addition to the foregoing factors, the Ninth Circuit has instructed courts to carefully

19  scrutinize cases that are settled prior to class certification for signs of possible collusion. *In re*

20  ────────────────

21  [9] Under CAFA, notice was sent to the 50 State Attorneys General, and Class Counsel has not
    heard from any Attorneys General. This is not to be interpreted in any way as an endorsement of

22  the Settlement by such attorneys' general—it is simply being noted for the record that no
    response from the attorneys' general was received, and no objections have been submitted.

23

24  [10] *See Shames,* 2012 WL 5392159, at *14 (approving settlement with 4.9% claims rate and
    collecting authorities); *see also In re TJX Cos. Retail Sec. Breach Litig.,* 584 F. Supp. 2d 395,

25  397, 406 (D. Mass. 2008) (approving settlement with rate of slightly more than 3%); *see also In
    re Compact Disc Minimum Advertised Price Antitrust Litig.,* 370 F. Supp. 2d 320, 321 (D. Me.

26  2005) (noting approval 2% rate); *see also Strong v. BellSouth Telcoms., Inc.,* 173 F.R.D. 167,
    169, 172 (W.D. La. 1997) (4.3%); *see also Forcellati v. Hyland's Inc.*, No. CV 12-1983-GHK

27  (MRWx), 2014 WL 1410264, at *6 (C.D. Cal., Apr. 9, 2014) ("[T]he prevailing rule of thumb
    with respect to consumer class actions is 3-5 percent.").

28

*Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011). These signs include instances where (1) class counsel receives a disproportionate distribution of the settlement or the class receives no monetary distribution, (2) unawarded funds revert to the defendants rather than to the settlement fund for the class, and (3) a "clear sailing" fee arrangement provides for the payment of attorneys' fees separate and apart from class funds exists. *Id.* When these signs are present, "the Court must 'examine the negotiation process with even greater scrutiny than is ordinarily demanded." *In re HP Laser Printer Litig.*, No. SACV 07-0667 AG RNBX, 2011 WL 3861703, at *4 (C.D. Cal. Aug. 31, 2011) (quoting *In re Bluetooth*, 654 F.3d at 947).

This Settlement is entirely free of collusion, having been reached only with the persistence of a well-respected mediator. Class Counsel also are not receiving a disproportionate amount of the Settlement. Class Counsel's fee request represents 33% of the monetary benefit of the Settlement, a percentage that is above the Ninth Circuit benchmark of 25% in common fund cases but well within the range of approved settlements.[11] *In re Bluetooth*, 654 F.3d at 942; *see also Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000). Further, in *In re Bluetooth* the court was faced with a settlement that did not provide <u>any</u> monetary payments to Class Members, a stark contrast to the hundreds if not thousands of dollars in cash available to Settlement Class Members here. *In re Bluetooth*, 654 F.3d at 945. In addition, Class Counsel are seeking their fees as a percentage of the total value created by the Settlement, rather than requesting an amount separate and apart from the funds paid to the Class. *See Staton v. Boeing Co.*, 327 F.3d 938, 970 (9th Cir. 2003); *see also In re Bluetooth*, 654 F.3d at 948-49. Thus, the first factor, typically indicative of collusiveness, is absent from this Settlement.

Second, the Settlement doesn't feature any reverter at all. That is, all of the money gets paid out to the Settlement Class Members, and uncashed checks go to *cy pres*. The court's concerns in *In re Bluetooth* surrounding a reverter clause focused on its presence in addition to a

---

[11] In accordance with this Court's Order granting Preliminary Approval to the Settlement (dkt. 70), Class Counsel filed its Motion for Award of Reasonable Attorneys' Fees and Expenses, and Incentive Award on August 2, 2018 (dkt. 73) and a copy of the Motion was posted to the Settlement Website. A more thorough discussion of the reasonableness of Class Counsel's fee request may be found therein, including an analysis of fee awards in comparable cases approved by courts in the Ninth Circuit.

clear sailing provision if they worked in conjunction to provide for unreasonably high attorneys' fees at the expense of relief to the Class. *In re Bluetooth*, 654 F.3d at 949. In contrast, this Settlement provides monetary relief to the Class and a proportional fee award. This Settlement doesn't contain a reverter, rendering the analysis largely academic.

Finally, while the Settlement includes a "clear sailing" provision (an agreement by Defendant not to object to a fee request up to a certain amount), the requested fees were negotiated solely as a percentage of the overall value of the Settlement, a condition that inextricably links Class Counsel's fees to the value obtained for the Class. A "clear sailing" provision in and of itself is not an indication of collusiveness, and courts, including those in the Ninth Circuit, "recognize[] that clear sailing agreements are routinely accepted in both the federal and California courts." *Hartless v. Clorox Co.*, 273 F.R.D. 630, 645 n.6 (S.D. Cal. 2011); *see also In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 553 (Cal. Ct. App. 2009); *see also Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2nd Cir. 1985). To be sure, the *In re Bluetooth* court cautioned against clear-sailing provisions where the requested fee is agreed upon independently of the amount provided for the class, not by its mere presence in a settlement. *In re Bluetooth*, 654 F.3d at 947. This is because such an arrangement can enable a Defendant to "pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." *Id*. (citation omitted). This Settlement raises no such concern as Class Counsel negotiated their fees as a percentage of the Settlement. There is no evidence of collusion.

In conjunction with the factors raised in *In re Bluetooth*, courts may also look to both the assurances of counsel and the presence of a neutral mediator as factors "weighing in favor of a finding of non-collusiveness," though neither is "on its own dispositive." *Id.* at 948. This case was settled only after a formal full day mediation session with a well-respected mediator who ensured that the process was conducted at arms'-length. *See e.g. Wren*, 2011 WL 1230826, at *14; *see also In re HP Laser Printer Litig.*, 2011 WL 3861703, at *4. Thus, when placed under the stricter lens established by *Bluetooth*, the Settlement remains free of any of the collusive elements cautioned against, compares favorably to numerous other TCPA settlements approved

1   throughout the nation and most importantly, represents an extraordinary victory for the Class.

2       In short, each factor supports final approval.

3   **VI.    THE SETTLEMENT CLASS MAY BE CERTIFIED—IN re HYUNDAI PRESENTS**
4   **        NO BAR TO APPROVAL HERE.**

5       As a final consideration, the Court must certify the Class for settlement purposes. The

6   Court's preliminary approval Order granted preliminary certification (dkt. 70), and there is no

7   reason appearing in the record for why certification shouldn't be made final here. Put simply, this

8   settlement readily meets each of the requirements of Rule 23(a) and of Rule 23(b)(3).

9       At the hearing on Plaintiff's Motion for Preliminary Approval, the Court indicated that it

10  wanted the instant Motion to analyze the impact of *In re Hyundai & Kia Fuel Econ. Litig.*, 881

11  F.3d 679, 689 (9th Cir. 2018), *reh'g en banc granted sub nom. In re Hyundai And Kia Fuel Econ.*

12  *Litig.*, No. 15-56014, 2018 WL 3597310 (9th Cir. July 27, 2018) on the instant Settlement. The

13  short answer is that it has none. The Ninth Circuit recently granted rehearing *en banc* and has

14  ordered that, "[t]he three-judge panel disposition in these cases shall not be cited as precedent by

15  or to any court of the Ninth Circuit." *In re Hyundai And Kia Fuel Econ. Litig.*, No. 15-56014,

16  2018 WL 3597310, at *1 (9th Cir. July 27, 2018). As *Hyundai* may not be cited as precedent to or

17  by this Court, it should not be found to impact the instant Settlement in any way.

18      Yet even if the Ninth Circuit hadn't granted *en banc* review and ordered that *Hyundai* be

19  ignored, the case still wouldn't bar the Agreement reached here. *Hyundai* analyzed CAFA

20  jurisdiction and the application of California state law to a nationwide class.[12] To the extent

21  *Hyundai* remains good law, the Court has a duty when reviewing class action settlements so as to

22  weigh predominance, which may be impacted by variations in state law. Here no state-law claims

23  were alleged. That said, such claims, to the extent they cover the same conduct at issue in this

24  case, are released by the instant Agreement, though the question is not jurisdictional but, rather,

25  whether the release is fair, reasonable, and adequate given the relief offered.

26

27  _____

28  [12] The Court's jurisdiction in this case, which alleges a question of federal law, isn't in doubt.

In the telemarketing space, most state statutes that overlap with the conduct regulated by the TCPA award comparable statutory damages.[13] While some states, most notably Connecticut ($20,000 per violation) and New Jersey ($10,000 for first offense, $20,000 for additional offenses), offer stiffer penalties, it is unclear whether such laws were violated in this case. For example, Conn. Gen. Stat. § 42-288a (1996) may require a showing of actual damages—which is not required for an award of statutory damages under the TCPA. Likewise, New Jersey's statute regulates pre-recorded voice messages and is likely limited to calls made within the State. N.J. Stat. Ann. § 48:17-28 (West 1998) ("A caller within the State shall not use a telephone or telephone line to contact a subscriber within the State to deliver a recorded message other than for emergency purposes."). Indeed, such state laws may not apply to interstate calling at all.

Consequently, there is no reason to conclude, particularly given *Hyundai's* lack of precedential authority, that predominance would be defeated here by virtue of "mini-TCPA" state statutes. As such, *Hyundai* doesn't present any hurdle for approval.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiff Gergetz respectfully requests the Court enter an Order granting Final Approval to the Class Action Settlement reached in this case and provide such other and further relief as the Court deems reasonable and just.

Dated: August 23, 2018                         Respectfully Submitted,

                                               **Nathan Gergetz**, individually and on behalf of the
                                               Settlement Class

                                                /s/ Steven L. Woodrow

                                               One of Plaintiff's Attorneys

                                               Richard T. Drury
                                               richard@lozeaudrury.com
                                               Rebecca Davis
                                               rebecca@lozeaudrury.com

---

[13] *See, e.g.,* https://www.alston.com/-/media/files/insights/publications/2014/10/iprivacy--security-advisoryi-is-your-organization/files/view-advisory-as-pdf/fileattachment/14803-minitcpaadvisory.pdf (last visited August 16, 2018.)

LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Telephone: (510) 836-4200
Facsimile: (510) 836-4205

Steven L. Woodrow*
(swoodrow@woodrowpeluso.com)
Patrick H. Peluso*
(ppeluso@woodrowpeluso.com)
Woodrow & Peluso, LLC
3900 East Mexico Ave., Suite 300
Denver, Colorado 80210
Telephone: (720) 213-0675
Facsimile: (303) 927-0809

Stefan Coleman, Esq.
LAW OFFICES OF STEFAN COLEMAN, LLC
201 S Biscayne Blvd, 28th Floor
Miami, Florida 33131
Telephone: (877) 333-9427
law@stefancoleman.com

*pro hac vice

1

2

**CERTIFICATE OF SERVICE**

3

I, Steven L. Woodrow, an attorney, hereby certify that I served the foregoing papers by

4

causing true and accurate copies of such papers to be transmitted to all counsel of record through

the Court's electronic filing system on August 23, 2018.

5

6

7

/s/ Steven L. Woodrow

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28